UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JOSEPH BOWMAN CORMIER             CIVIL ACTION NO. 6:09-cv-00703

VERSUS                            MAGISTRATE JUDGE HANNA

LAFAYETTE CITY-PARISH             BY CONSENT OF THE PARTIES
CONSOLIDATED GOVERNMENT,
ET AL.

**FINDINGS  OF  FACT
AND
<u>CONCLUSIONS  OF  LAW</u>**

### *<u>Procedural Background</u>*

The plaintiff, J.B. Cormier, and his wife, Mary Ann Henry Cormier, filed suit

on April 29, 2009 seeking damages under 42 U.S.C. § 1983 and various state law tort

theories.[1]  Jurisdiction is premised on 28 U.S.C. § 1331 for the plaintiff's claims

under 42 U.S.C. § 1983 and 28 U.S.C. § 1367(a) for the plaintiff's state law claims.

The parties consented to trial before this Court pursuant to 28 U.S.C. § 636(c).

The plaintiff sued the Lafayette City-Parish Consolidated Government, the

Lafayette City Police Department, the Lafayette City Prosecutor's Office, Lafayette

City Marshal Earl "Nickey" Picard, Lafayette Deputy City Marshal Timothy Picard,

Lafayette City Prosecutor Gary J. Haynes, Lafayette City Prosecutor Shane M.

---

[1]     Mary Ann Cormier voluntarily dismissed her claims on April 20, 2012.

Mouton, and Lafayette city police officers Nolvey Stelly, Heather Martin, and Chase Guidry.

The plaintiff's claims against the Lafayette Police Department, the Lafayette City Prosecutor's Office, Gary J. Haynes, Shane M. Mouton, and Chase Guidry were dismissed by summary judgment and the rulings were not appealed.  Heather Martin, Nolvey Stelly, and Lafayette City-Parish Consolidated Government in its capacity as the employer of Gary Haynes also filed a motion for summary judgment which was denied in part.  That part of the ruling was reversed by the Fifth Circuit Court of Appeals which held that the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477 (1994), barred the § 1983 claims against Stelly and Martin, and since the actions of these defendants pertaining to the arrest of Cormier and his subsequent prosecution were not actionable*,* the state law claims against Stelly, Martin, and Lafayette Consolidated Government as the employer of Haynes also failed.[2]  With the appellate court ruling, only Mr. Cormier's claims against Earl and Timothy Picard remained for trial.

---

[2]     The Court of Appeals erroneously stated in its opinion that this Court granted summary judgment in favor of the Lafayette Consolidated Government on all state law claims involving the police officers. *Cormier v. Lafayette City-Parish Consolidated Government,* 493 Fed. App'x 578, 582 (5th Cir. 2012).  However, the point is moot as the Court of Appeals dismissed all state law claims against the police officers in its opinion, and therefore, Lafayette Consolidated Government cannot be liable for any of their actions.

The plaintiff asserted six claims against the Picards.  The first is a claim under § 1983 for violation of the plaintiff's rights of due process, equal protection, and liberty under the Fourth and Fourteenth Amendments to the United States Constitution and the parallel provisions of the Louisiana state constitution.  The plaintiff also claims that the defendants' actions constitute the torts of defamation, malicious prosecution, false imprisonment, intentional infliction of emotional distress, and negligent hiring and/or supervision under Louisiana state law.

At the close of the plaintiff's case, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 52(c) with regard to all claims.  Finding that the plaintiff had not carried his burden of proof with regard to his claims for malicious prosecution, false imprisonment, intentional infliction of emotional distress and negligent hiring and/or supervision, the Court granted the defendants' motion with regard to those claims.  The Court deferred ruling on the defendants' motion concerning the plaintiff's § 1983 and defamation claims.  At the close of the evidence the defendants re-urged their motion, and the plaintiff also sought judgment as a matter of law.  Both motions were denied.

The Court, having carefully considered the testimony of all of the witnesses, the exhibits entered into evidence at trial, the record of this action, and the applicable law, now makes the following findings of fact and conclusions of law as required by

Fed. R. Civ. P. 52.  To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

### *Findings of Fact*

On April 29, 2008, the plaintiff, who is a retired Captain from the Lafayette City Police Department, called the Lafayette police to complain about vagrants trespassing on his property, a vacant lot located at the corner of South Pierce and West Simcoe Streets.  Corporal Heather Martin and Officer Chase Guidry responded to the call, and as they approached the location, a woman later identified as Melanie Green flagged them down and reported that someone (who was later identified as Cormier) was on the vacant lot, waving a gun around, saying that he owned the lot and did not want homeless people on it.

Martin and Guidry approached Cormier, explained that they were investigating both his trespassing complaint and a complaint about a disturbance at the location, and began reading him his rights.  Cormier became upset and began using profanities in a loud voice.  Martin called Sgt. Dewitt Sheridan who also came to the scene and talked with Cormier.  Sgt. Sheridan learned that Cormier was upset because, even after multiple complaints, nothing had been done to keep vagrants from trespassing on his lot.  According to Sgt. Sheridan, Martin advised that several subjects had seen

-4-

Cormier push a person to the ground and that Cormier "had pulled out a gun on the people around there."  The person who had been pushed to the ground had already left the area.  Sgt. Sheridan called the watch commander, Lt. Green, to report what had occurred and reported that the alleged victim had left the area.  Lt. Green inquired whether Cormier had pointed the gun at anyone to which Martin responded that no one could say that he did.  Lt. Green advised Sgt. Sheridan "that there was no violation and no arrest could be made."  After talking with Sgt. Sheridan and without being issued a summons of any kind, Cormier left the vacant lot to go to the police department to get a "no trespass" letter.

Martin obtained a written statement from Melanie Green, who stated:  "I Melanie Green was walking on Simcoe when I heard this man yelling at a homeless man not to walk on his yard.  The man must of not heard so that's when the man opened his trunk and pulled out his gun then ran to the man and pushed him out.  He was yelling and pulling his gun out on everyone."

The homeless man, Greg Greer, who was not at the scene when the officers arrived, soon called 911 to complain about the incident.  Sgt. Sheridan met Greer and obtained a written statement which indicated that, as Greer was leaving St. Joseph's Diner and walking back towards downtown, he cut across a grass covered lot on the corner of Pierce Street.  He stated that a man on the lot, next to a black Crown

Victoria, started yelling at him, went into the trunk of his car, pulled out a hand gun that appeared to have a wooden grip, put the gun in a holster, and "came after me." Greer went on to state that the man pushed him down to the ground, removed the gun from the holster, and yelled at him to leave the lot.

Sgt. Sheridan called Lt. Green again and advised that Greer wanted to file charges against Cormier.  Although Sgt. Sheridan's oral report to Lt. Green was different from the statement given by Greer, based on the information that was relayed, Lt. Green instructed that Cormier be issued a summons for simple battery. Sgt. Sheridan advised that Cormier was on his way to the police station, and Lt. Green instructed that whoever took the report from Greer should meet Cormier at the station, advise him that Greer wanted to file charges, and issue a summons.

When Martin arrived at the police station, Cormier was inside talking with Lt. Nolvey Stelly.  Lt. Stelly testified that, either while in the lobby of the police station or in the station parking lot, Cormier cursed in a loud voice and called Lt. Stelly a racist, an action for which Lt. Stelly wanted to file a complaint but was told not to do so by one of his superiors.  After Lt. Stelly and Cormier walked outside to the police station parking lot, Martin prepared a misdemeanor summons for simple battery and issued it to Cormier.

Martin, who this Court found to be credible, testified that it was originally her intent to issue a summons to Cormier for disturbing the peace based on what she observed at the vacant lot.  When she arrived, there was no vagrant person on the property, therefore, she could not issue a summons for trespassing in response to Cormier's complaint.  Nor was she aware of the details involving Greer, but she did observe Cormier disturbing the peace by cursing in a loud voice – a fact Cormier has admitted.   After Greer's statement was obtained by Sgt. Sheridan, Martin's supervisors ordered her to issue a summons for simple battery rather than disturbing the peace.

At some point before May 1, 2008, Cormier called Police Chief Jim Craft to complain about an incident on his property on April 29 in which a transient threw a filled water bottle at him.  Since this action would constitute an assault, Chief Craft asked Major Jackie Alfred to conduct an investigation into Cormier's complaint, specifically to determine whether the transient was charged with a crime.  Major Alfred recused himself because of his longstanding friendship with Cormier and delegated the investigation to Captain Jimmy Smith.

Capt. Smith asked Lt. Stelly to write a statement concerning his involvement in the events of April 29, and to obtain statements from Martin and Sheridan.  Lt. Stelly asked Martin to write a statement setting forth the events of April 29 as part of

an "investigation," a request she thought was out of the ordinary.  She complied and gave her three page statement dated May 2, 2008 to Lt. Stelly.  Lt. Stelly testified that he gave Martin's statement, Sheridan's statement, and his own statement to Capt. Smith.  Unlike the summons for simple battery, these statements, as part of an internal investigation, were not public record.

Police department records show that, on May 2, 2008, Lt. Stelly obtained "statements" relating to this matter from clerk 140 in the police department records room.  These statements were of Greg Greer and Melanie Green as they were in the records room and there is no evidence that any other statements were in the records room as of that date.  A copy of the summons was also given to Lt. Stelly on May 2, 2008 by clerk 082.  It is not clear whether the summons given to Lt. Stelly was actually the only one kept in the records room or just a copy of that summons.  Lt. Stelly gave Martin copies of the summons, the two witness statements, and her own statement.  Therefore, this Court finds that on or about May 2, 2008, Lt. Stelly and Martin had in their  possession, for at least some period of time, copies of the two witness statements, the summons, and the statement prepared by Martin as part of the internal investigation.

Sgt. Sheridan was assigned the task of following up on Cormier's complaint concerning the transient throwing the water bottle at him – an action described in the

police records as an aggravated assault.  On May 21, Sheridan called Cormier to come in and make a statement the next day regarding the aggravated assault.  When Cormier arrived, he advised Sheridan that he "did not want to get anyone in trouble and he wanted to let it go."  When asked if he wanted to fill out a statement anyway, Cormier declined and stated that everything was fine.  Sheridan went to speak to Lt. Stelly about it, and when he returned, Cormier was gone.

Deputy City Marshal Timothy Picard contacted Martin in late May or June of 2008 while she was working a private security shift at the Olive Garden restaurant in Lafayette.  Acting on behalf of the City Prosecutor's office, he requested a copy of the summons that she had issued to Cormier because the summons could not be readily located.  The routine and customary practice is for one copy (the green copy) of the summons to remain with the officer who prepared it, one copy is given to the defendant, and two copies are given to the Lafayette police department, one of which would be forwarded to the city prosecutor's office.  No explanation was provided concerning why the summons could not be readily located from the police department or the city prosecutor's office.  However, after a subsequent internal investigation was conducted, it was determined that a copy of the summons was forwarded by the Records Section to the City Prosecutor's office on April 29.

Martin met with Timothy Picard and gave him a copy of the largely illegible green copy of the summons from her summons book.  She also gave Timothy Picard copies of the summons, her statement, and the two witness statements that were previously given to her by Lt. Stelly.

Timothy Picard acknowledged that he received documents from Martin including the summons, Martin's statement, and two witness statements.  He testified that he only made a copy of the summons, gave it to his father, Marshal Earl "Nickey" Picard, and then returned all of the documents to Martin.  He categorically denied giving copies of the witness statements or Martin's statement to his father.  Marshal Picard confirmed that Timothy Picard only gave him a copy of the summons.

At some point,  Marshal Picard discovered an unmarked, unstamped, brown clasped envelope containing the summons, Martin's statement, and the two witness statements just sitting on his desk.  The summons was a copy of the one provided to Lt. Stelly on May 2 by clerk 082.  Marshal Picard testified the envelope simply appeared on his desk and he did not know who put it there.  He questioned his staff and got no answers.  Marshal Picard read the documents then locked them in a file cabinet in his office.

Chief Craft confirmed that the summons issued to Cormier on April 29, 2008 is a public record while the statement prepared by Martin for the internal

-10-

investigation and dated May 2, 2008 is a confidential police document that was not to be disclosed outside the police department.

On approximately July 11, 2008, Cormier qualified to run against Marshal Picard for the post of Lafayette City Marshal.  On July 17, Lt. Stelly was contacted by Timothy Picard and was told that Marshal Picard wanted Lt. Stelly to call him. Marshal Picard wanted to talk to Lt. Stelly about the documents in the brown envelope because Stelly's name was on the summons.  Lt. Stelly did call and was asked to come to Marshal Picard's house.  When Lt. Stelly went to Marshal Picard's house, Marshal Picard got into Lt. Stelly's car and questioned him about the different case numbers assigned to the summons for simple battery and the statement prepared by Martin.

Different case numbers were on the summons and the statement because one number was assigned when Cormier called in the trespass complaint concerning his property.  That number appeared on the summons.  The second number was assigned when Capt. Smith began the internal investigation into Cormier's claim that a transient threw a water bottle at him.  However, that is not the information Lt. Stelly provided to Marshal Picard and Lt. Stelly did not ask that the statement of Martin be returned.

At some point after July 17 but before July 21, Marshal Picard gave the documents that had been delivered to his office in the brown envelope to Deputy Marshal Phillip Conrad along with instructions to deliver them to Chuck Huebner, a local television news anchor with KLFY Channel 10.  Marshal Picard testified that he believed the contents of the documents that he had delivered to Huebner were true because they were police department documents.  He also stated that he believed the public was entitled to know about the issuance of the summons to Cormier and about the incident underlying the issuance of the summons.

On July 21, Huebner aired a story concerning Cormier and the events of April 29.  The following day, July 22, the City Prosecutor issued a bill of information, charging Cormier with aggravated assault in connection with the April 29 incident; however, the bill was not actually filed until August 5.  Cormier was not served with this bill of information and had no knowledge of it until he was arraigned on September 8 when Cormier believed he was being arraigned for simple battery.

There were two news reports by Huebner, both before the election, and the second broadcast contained a statement that if Cormier was elected City Marshal and found guilty of the crimes with which he was charged, he would have to be removed from office.  Both simple battery and aggravated assault are misdemeanors; therefore,

if Cormier had been convicted of either of those crimes and elected City Marshal, he would not have been required to give up his elected position.

Marshal Picard did not talk with Huebner concerning the documents that were delivered to him.  Marshal Picard denied telling Huebner that Cormier should have been charged with aggravated assault and denied telling Huebner that Cormier would have to give up his elected position if he was elected City Marshal and convicted of either simple battery or aggravated assault.  Marshal Picard admitted stating at a candidate's forum that Cormier would have to answer charges of simple battery and aggravated assault.  He was aware of this as he had seen the arraignment docket for Cormier that same day.  The date of the arraignment was September 8.

Chief Craft saw the first television broadcast and either saw a picture of Martin's written statement or heard the newscaster indicate that he had a statement from Martin.  Chief Craft believed that a confidential police document had been leaked to the media.  On July 25, Cormier wrote a letter to Chief Craft advising that he had been contacted on July 21 by a reporter concerning the events of April 29 and expressing his concern that the reporter had information concerning an internal police matter.

Chief Craft ordered an internal investigation concerning the leak of confidential police documents to the media.  By letter dated September 19, Chief

-13-

Craft responded to Cormier's letter of July 25, explaining that the misdemeanor summons for simple battery was a public document but that the police officer's statement was a confidential internal record.  Four officers had contact with the document:  Capt. Smith, Lt. Stelly, Sgt. Sheridan, and Cpl. Martin.  Sheridan and Smith were cleared of any wrongdoing.  The investigation confirmed that Martin gave a copy of her statement and a copy of the summons to defendant Timothy Picard upon his request, but "[t]he release of this internal document to the City Marshal's Office was not intentional and was done with no knowledge that the document would be given to the media."  Corrective action was taken with regard to both Martin and Stelly.  In the report of the internal investigation from Chief Craft, there is no discussion of the brown envelope that appeared on Marshal Picard's desk even though Marshal Picard was interviewed by the investigators.  Rather, the findings dealt only with Martin giving Timothy Picard a copy of the documents.

In the October 2008 election, Cormier was not successful in his bid for election, and Marshal Picard was re-elected.

Cormier's trial on the charges arising out of the events of April 29 was set for November 12, 2008 before Judge Frances Bouillion in Lafayette City Court.  Neither Ms. Green nor Mr. Greer appeared for trial, and the aggravated assault and simple battery charges were dismissed.  On that same day, a bill of information was issued

by the city prosecutor's office charging Cormier with disturbing the peace and disorderly conduct. The bill included a handwritten additional charge for the events that allegedly occurred in the police station parking lot. It is not clear when this addition was made. Six weeks later, at the request of the City Prosecutor's office, Lt. Stelly and Cpl. Martin executed affidavits for warrants of arrest for Cormier based on the events of April 29, 2008.

On April 24, 2009, Mr. Cormier was tried and convicted in Lafayette City Court on the charge of disturbing the peace with regard to the incident at the vacant lot. Mr. Cormier sought relief from Louisiana's Third Circuit Court of Appeal. That court issued an unreported ruling stating "[t]here is no error in the district court's ruling affirming Defendant's conviction for disturbing the peace."[3]  A writ application was filed with the Louisiana Supreme Court, but the writ was not considered because it was untimely filed.[4]

### *Conclusions of Law*

### THE PLAINTIFF'S §1983 CLAIM

The plaintiff claims that he is entitled to recover damages from defendants Timothy Picard and Earl Picard, under 42 U.S.C. § 1983, because their actions

---

[3]     Defendant's Exhibit 2.

[4]     *City of Lafayette v. Cormier*, 2010-1480 (La. 01/14/11), 52 So.3d 890.

-15-

violated his constitutionally-protected rights.  In his complaint, the plaintiff also asserted § 1983 claims against other persons who originally were defendants in this lawsuit.  Following summary judgment rulings by this Court, defendants Lafayette City-Parish Consolidated Government, Lt. Stelly, and Cpl. Martin appealed.  The Fifth Circuit Court of Appeals held that, because Cormier was ultimately convicted on the disturbing the peace claim that arose out of the events of April 29, 2008, the plaintiff's § 1983 claims and state-law tort claims against those defendants were barred by the *Heck* doctrine.[5]  Read broadly, the Fifth Circuit's ruling could preclude finding defendants Timothy Picard and Earl Picard liable to Cormier with regard to a claim for conspiracy under §1983.  However, even if the Fifth Circuit's opinion is not considered, the Court finds that Mr. Cormier has not prevailed on his § 1983 claim.

To prevail on a claim under § 1983, a plaintiff must prove:  (1) the deprivation of a right secured by the United States Constitution or federal law; (2) that occurred under color of state law, and (3) was caused by a state actor.[6]  Cormier argues that the defendants' actions violated his due process, equal protection, and liberty rights under

---

[5]    *Cormier v. Lafayette City-Parish Consolidated Gov't*, 493 Fed. App'x 578 (5th Cir. 2012).

[6]    *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004); *Bass v. Parkwood Hospital*, 180 F.3d 234, 241 (5th Cir. 1999); *Cinel v. Connick*, 15 F.3d 1338, 1342 (5th Cir. 1994).

the Fourth and Fourteenth Amendments to the United States Constitution.  The Court concludes, however, that the evidence failed to show that the plaintiff suffered any constitutional deprivation.

Timothy Picard's sole involvement in the relevant events was his asking Martin for a copy of the summons she issued to Cormier on April 29, 2008 and his delivering a copy of the summons to his father.  The summons is a public record.  The summons also accurately reflected the then-current charge against Cormier.  Timothy Picard had no involvement in the events of April 29 or in the ultimate prosecution of Cormier.  Therefore, there was nothing in Timothy Picard's actions that abridged Cormier's Fourth or Fourteenth Amendment rights.  Cormier's failure to prove the first element of his § 1983 claim against Timothy Picard is fatal to this claim.

Cormier's § 1983 claim against Marshal Picard fails for the same reason.  The evidence established that Marshal Picard received a copy of the summons from Timothy Picard and a copy of the summons, Martin's statement, and the two witness statements from an unknown source.   Marshal Picard met with Lt. Stelly to investigate the different case numbers on these documents because Stelly's name was on the summons.  Marshal Picard had the documents delivered to Huebner which resulted in Huebner presenting one or two news broadcasts, the complete contents of which was not established.  Like his son, Marshal Picard had no involvement in the

-17-

events of April 29 or the prosecution of Cormier.  There is no evidence Marshal Picard's actions violated Cormier's Fourth or Fourteenth Amendment rights.

The Court also considered whether these defendants conspired with anyone to violate Cormier's constitutional rights.  In order to prevail on § 1983 conspiracy claim, a plaintiff must prove the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation.[7]  Mere allegations that a conspiracy existed are insufficient.  Instead, a plaintiff must establish specific facts to show that an agreement actually existed.[8]

The evidence did not establish that there was an agreement between Marshal Picard, Timothy Picard, and any other person to violate the plaintiff's constitutional rights.  Furthermore, as stated previously, the Court has found that there was no evidence that the plaintiff's constitutional rights were violated by either Marshal Picard or Timothy Picard.  Accordingly, the Court concludes that the plaintiff has failed to prove that there was a conspiracy to deprive Cormier of his constitutionally-protected rights.

## THE PLAINTIFF'S DEFAMATION CLAIM

---

[7]     *Cinel v. Connick*, 15 F.3d at 1343.

[8]     *Tebo v. Tebo*, 550 F.3d 492, 496 (5th Cir. 2008).

-18-

The plaintiff's final claim is that the actions of Timothy Picard and Marshal Picard constitute the state-law tort of defamation. Defamation is a tort involving the invasion of a person's interest in his or her reputation and good name. To prevail on a defamation claim, the plaintiff must prove four elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting to negligence or greater on the part of the publisher; and (4) resulting injury.[9]

A statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule.[10] A statement must be false to be defamatory since truth is an absolute defense to an action for defamation.[11]

Publication means the communication of non-privileged defamatory words to even one single person.[12] A defendant who utters a defamatory statement is

---

[9]      *Kennedy v. Sheriff of East Baton Rouge*, 2005-1418 (La. 07/10/06), 935 So.2d 669, 674-675; *Costello v. Hardy*, 03-1146 (La.1/21/04), 864 So.2d 129, 139; *Trentecosta v. Beck*, 96-2388 (La. 10/21/97), 703 So.2d 552, 559.

[10]      *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d at 674-675; *Costello v. Hardy*, 864 So.2d at 139; *Trentecosta v. Beck*, 703 So.2d at 559.

[11]      *Pool v. Gaudin*, 24 So.2d 383, 383 (La. 1945).

[12]      *Martin v. Lincoln General Hosp.*, 588 So.2d 1329, 1333 (La. App. 2 Cir. 1991), *writ denied*, 592 So.2d 1302 (La. 1992); *Toomer v. Breaux*, 146 So.2d 723 (La .App. 3 Cir. 1962), *writ*

responsible for all republication that is the natural and probable consequence of the author's act.[13]

The fault requirement for a defamation claim is generally referred to in the jurisprudence as malice, actual or implied.[14]  In Louisiana, defamatory words have traditionally been divided into two categories:  those that are defamatory per se and those that are susceptible of a defamatory meaning.  Words that expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se.[15]  Therefore, when a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant.  Injury may also be presumed.[16]

A pure statement of opinion, which is based totally on the speaker's subjective view and which does not expressly state or imply the existence of underlying facts,

_____

*denied* (not reported 1963).

[13]     *Martin v. Lincoln General Hosp.* 588 So.2d at 1333; *Wattigny v. Lambert*, 408 So.2d 1126 (La. App. 3 Cir.), *writ denied* 410 So.2d 760 (1981), *cert. denied* 457 U.S. 1132 (1982); *Giordano v. Tullier*, 139 So.2d 15 (La. App. 4 Cir. 1962).

[14]     *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d at 674-75; *Costello v. Hardy*, 864 So.2d at 139.

[15]     *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d at 674-75.

[16]     *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d at 674-75.

generally is not actionable in defamation since falsity is an indispensable element of any defamation claim, and a purely subjective statement can neither be true nor false.[17]  The crucial difference between a statement of fact and a statement of opinion depends on whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.[18]

A public figure is someone who makes his living by dealing with the public or otherwise seeking public patronage, i.e., consciously wanting public support for his activities; therefore, he submits his private character to the scrutiny of those whose patronage he implores.[19]  A candidate for public office is held to the same standard as a public official for defamation purposes.[20]  Since Cormier was running for public office at the time of these events, the Court finds that he was a public figure at all relevant times.

In cases involving statements made about a public figure, a plaintiff must prove actual malice, i.e., that the defendant either knew the statement was false or acted

_____

[17]     *Bussie v. Lowenthal*, 535 So.2d 378, 381 (La. 1988).

[18]     *Mashburn v. Collin*, 355 So.2d 879, 885 (La. 1977).

[19]     *Copeland v. Copeland*, 2007-0177 (La. 10/16/07), 966 So.2d 1040, 1053.

[20]     *Badeaux v. Southwest Computer Bureau, Inc.*, 2005-0612 (La. Mar. 17, 2006), 929 So.2d 1211, 1218; *State v. Defley*, 395 So.2d 759, 761 (La.1981).

-21-

with reckless disregard for the truth.[21]  Therefore, for a public figure to prevail on a defamation claim, he must show that the person publishing false information knew that the information was false or published the information with reckless disregard for whether the information was false or not.[22]

The evidence does not establish that Timothy Picard defamed Cormier. Timothy Picard obtained copies of certain documents from Martin and gave his father a copy of the summons issued on April 29, 2008.  Even if that summons was then given by his father to Channel 10 and even if the contents of the summons were broadcast by Channel 10, there was no defamation.  A summons is a public record and, as set forth below, there is no evidence that any false information was set forth in the summons.  Therefore, the plaintiff failed to prove, with regard to Timothy Picard, that a false statement attributable to him was made by Huebner during a news broadcast.

Marshal Picard caused the summons, Martin's statement, and the two witness statements to be delivered to Huebner.  This was an unprivileged publication by Marshal Picard of the contents of those documents.  The evidence does not establish exactly what Huebner said on the air as there was no transcript, video, or audio

---

[21]    *Costello v. Hardy*, 864 So. 2d at 140-41.

[22]    *New York Times v. Sullivan*, 376 U.S. 254 (1964).

-22-

introduced, and Huebner did not testify.  Nor is it clear which of the documents, if any, were displayed during either broadcast.  Since the broadcast of July 21 led to the internal investigation of the leaked documents, the documents that Marshal Picard had delivered to Huebner are presumed to be the source information for Huebner's broadcasts concerning Cormier.  No statements made by Huebner other than the information found within the four corners of the documents delivered to him can be attributed to Marshal Picard since Marshal Picard did not talk with Huebner before the broadcast, but simply had the documents delivered to him.

If Huebner stated, as one witness understood, that Cormier struck a homeless man, that cannot be interpreted as a false statement, nor can it be said that Marshal Picard published this with a reckless disregard for its truth.  The witness statements and Martin's statement are consistent that Greer was pushed.  The summons says: "Defendant [Cormier] admitted pushing victim [Greer] as victim was walking off property."  Although Cormier now disputes whether he told Martin that he pushed Greer, the content of the summons cannot form the basis of a defamation claim in that regard.

If Huebner said, as was alleged in Cormier's complaint, that Cormier was charged with simple battery but should have been charged with aggravated assault,

that was likewise not a defamatory statement.[23]  This statement, assuming that it was made by Huebner, was an opinion, and therefore, it cannot be defamation.  Even assuming it is not an opinion, an assault is defined in La. R.S. 14:36 as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."  An aggravated assault is "an assault committed with a dangerous weapon." La. R.S. 14:37.  Based on Greer's statement, which is discussed in Martin's statement, if the facts as related by him are assumed to be true, a charge of aggravated assault could be brought, and in fact, was brought against Cormier.[24]

If Huebner said that Cormier was actually charged with aggravated assault, that statement might or might not be true, depending upon when it was made.  There were two broadcasts, one on July 21 and another on the eve of the election in October.  Marshal Picard stated at a candidates' forum that Cormier had appeared in City Court on that day to be arraigned on the aggravated assault charge.  The arraignment date was September 8.  The bill of information charging him with aggravated assault was dated July 22 and filed on August 5, 2008.  If the broadcast took place after July 22,

---

[23]     The only evidence of this was based on double hearsay contained within the transcript of a proceeding in City Court.  This Court does not find that meets the necessary standard of proof, but it is considered here for the sake of completeness.

[24]     This Court does find it troubling that the day after the first broadcast, the City Prosecutor charged Cormier with aggravated assault and he was not made aware of that fact until months later.  However, the actions of the City Prosecutor are subject to absolute immunity, as this Court found, and which the plaintiff did not appeal.

and if Huebner said that Cormier was charged with aggravated assault, this was not defamation because that statement was true.  If, however, the statement was made in a broadcast before July 22, the statement was false, but there is no evidence to support the conclusion that this statement was actually made before July 22.

If Huebner said in either of his broadcasts that Cormier would have to give up his elected position if elected City Marshal and convicted of aggravated assault, that statement was false.  No evidence was presented to show where Huebner got that idea and there is nothing in any of the documents to support such a statement.  Therefore, that statement cannot be imputed to Marshal Picard.  Furthermore, Marshal Picard testified that both simple battery and aggravated assault are misdemeanors and that, for that reason, Cormier would not have been forced to forfeit his seat had he been elected City Marshal and convicted of either of those two crimes.

Since Cormier was a candidate for public office when the statements were made, he was a public figure.  For that reason, it was necessary for him to prove that Marshal Picard acted with actual malice or with reckless disregard for whether the information he published to Huebner was true or false.  Marshal Picard did publish a confidential police department document to Huebner who ran some stories about the charges against Cormier on two occasions.  It is reasonable to infer that Marshal Picard knew the document was confidential because of the way it was delivered to his

office and because he locked it in a file cabinet for some period of time before discussing it with Lt. Stelly and having it delivered to Huebner.  It is also reasonable to infer that Marshal Picard gave the documents to Huebner in order to gain a political advantage over Mr. Cormier, his political rival, since he did not publish the documents until after Cormier qualified as a candidate.  Marshal Picard's stated purpose in publishing the documents was to inform the public about the incident of April 29 involving Cormier because he thought the public had a right to know what actions of a person running for political office caused the summons to be issued. While these facts are determinative of his motivation, there is no evidence that Marshal Picard knew the information in the documents was false even assuming that any of it actually was false.

The Court further finds that Marshal Picard did not publish the documents with a reckless disregard for whether the information set forth in them was true or false. Marshal Picard made an effort to reconcile the different case numbers on the documents.  It is reasonable to infer from this effort that Marshal Picard was attempting to verify that the summons and the other documents were related to each other and equally reliable.  Second, Marshal Picard did not talk with Huebner about the documents.  Instead, he permitted Huebner to draw whatever conclusions that he might from the documents and to make any statements that he might concerning the

documents.  Therefore, the Court finds that Cormier also failed to prove this element of his defamation claim.

The final element of a defamation claim is injury.  Mr. Cormier proved that he is justifiably proud of his reputation as a man who honorably served his country as a United States Marine during the Viet Nam conflict and who thereafter served his community just as honorably as a longtime member of the Lafayette Police Department and served his state as an investigator for the attorney general.  He earned his standing in the community, and he is rightfully protective of his reputation. However, the evidence presented did not establish that any person voted for Marshal Picard rather than for Cormier in the 2008 election because of the broadcasts by Channel 10.  The evidence established that Cormier was concerned and possibly upset about the broadcasts, but it did not establish that he sustained compensable mental or physical injuries because of the broadcasts.

In summary, the Court finds that Cormier failed to meet his burden to prove all of the necessary elements of his defamation claim against Earl "Nickey" Picard.

Defamation is an individual tort which, as a general rule, does not give rise to solidary liability.  There are exceptions to the general rule, such as when the statements are made pursuant to a conspiracy to defame, in which case all persons connected in the conspiracy are solidarily liable.  Solidary liability among individuals

for defamatory statements is contingent upon proof of a conspiracy among them to defame the plaintiff.[25]

In this case, the Court considered whether the defendants conspired to defame Cormier.   The initial publication was by Martin, when she gave a copy of her statement to Timothy Picard.  However, the evidence supports the conclusion that the publication by Martin to Picard was privileged because Picard was acting on behalf of the City Prosecutor's office.  Another publication occurred when an unknown party gave a copy of Martin's statement to Marshal Picard.  Another publication occurred when Marshal Picard gave the documents to Huebner.  The final publication occurred when Huebner put the story on the air.  In order to prevail on such a claim, however, the plaintiff must prove, by a preponderance of the evidence, the existence of an agreement to defame as well as defamatory acts.[26]

In this case, the evidence did not establish that there was an agreement between Marshal Picard and any other current or former defendant to defame Cormier. Similarly, no evidence was presented at trial showing an agreement between Timothy Picard and any other current or former defendant to defame Cormier.  Furthermore,

---

[25]      *Trentacosta v. Beck*, 703 So.2d at 558.

[26]      See, e.g., *Dietz v. Dietz*, No. 08-0521, 2009 WL 2707402, at * 10 (W.D. La. Aug. 27, 2009); *Aranyosi v. Delchamps, Inc.*, 98-1325 (La. App. 1 Cir. 06/25/99), 739 So.2d 911, 917 (La. App. 1 Cir.,1999), *writ denied*, 99-2199 (La. 11/05/99), 750 So.2d 187.

the Court has found that there was no evidence that the plaintiff was defamed. Accordingly, the Court finds that the plaintiff did not prove the necessary elements of a claim for conspiracy to defame Mr. Cormier.

### CONCLUSION

The Court concludes that Mr. Cormier has not proven the elements of his § 1983 claim, has not proven the elements of his defamation claim, and has not proven the existence of a conspiracy to abridge his constitutional rights or to defame him. Therefore, Mr. Cormier is not entitled to recover any damages from the defendants. Judgment in favor of defendants Timothy Picard and Earl "Nickey" Picard will be entered.

Signed at Lafayette, Louisiana, this 12th day of August 2013.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE